The first case is Clayton Services v. Sun West Mortgage Company. Thank you. Good morning, Your Honors. Eric Brunstad on behalf of Sun West. In construing the contract at issue here to mean that Clayton did not have to perform its services in compliance with applicable agency guidelines, the district court applied an incorrect legal standard and misinterpreted the contract. What is the correct legal standard? Well, under the correct legal standard, we always take into account custom and practice. That's the New York Court of Appeals decision in Fox Films. To find out the party's intent from the language used, the court must place itself in the position of the parties when they made the contract. It must be informed of the meaning of the language as generally understood in that business. Well, Mr. Brunstad, did anyone testify at the trial that re-verification is a term of art within this profession and needs to be read a certain way, and everyone in the profession or most people in the profession would read it that way? Yes, Your Honor, and let me run through the four pieces of evidence. Excuse me, Mr. Fernandez doesn't count, right? You agree with that? I'm going to refer to the expert witnesses, the official guidelines, and the admission by Clayton. First, the official guidelines reproduced on page 12 of our brief. Everybody understands the post-closing QC review must include re-verification of the borrower's income, employment, and asset information. The lender must re-verify the borrower's income and employment information directly with the source of the original documentation. That's the custom and practice. What's that, Your Honor? There's a Fannie Mae's guideline? Correct, Your Honor. And then the expert witness, Ms. Day. Before we go further to other subjects. This is on that subject, Your Honor. I understand, but it's a, you're going, would you let me ask my next question? Certainly, Your Honor. Okay. If you look at page JA90, which is the amendment to the statement of work that contains various billing ways that you're going to be billed for this work, at the top of the chart, there are post-close QC services. Correct. And they're listed as conventional, there's a price for conventional, a price for FHA, VA, and a price for jumbo, whatever that means. Correct. I don't see a price for Fannie Mae. Is that of any significance? No, that's not, no significance, Your Honor, and here's why. As Ms. Day testified, the expert witness. I'm not, I want to know first about this. Here, we've got separate pricing for different kinds of services. Correct. For different agencies. Now, do all agencies have the same rules? They do not have exactly the same rules, but they all require the re-verification services to be performed in accordance with agency guidelines. Well, but if the agencies have different guidelines, then it's not so clear to me. That's true, but the most important one here, Your Honor. I wish you would let me. Certainly, Your Honor. Ask a question or comment, but it seems to me that there's not here a reference to any of that. It also seems to me, if you go down that chart, you see verification of employment, right? Yes, Your Honor. There's an extra upcharge if online is unsuccessful. That seems to imply that online is the expected way for verification, and if there is going to be something else, that has to be specifically authorized, and there's a specific upcharge for it. So why doesn't that say something more about what the parties think and interpret the contract to mean than guidelines of an agency that isn't even referred to here? Yes, Your Honor. JA 880. Clayton explained exactly the answer in their own internal memo. We perform the re-verification process as required by Fannie Mae post-closed QC guidelines. To the extent that we are requested by our client to order and review third-party re-verification reports and through the entire re-verification process, we perform these reviews in compliance with all appropriate agency guidelines as well. Here's why, Your Honor. When was that? What is the date on that? The date on it? This is a document that's JA-  Yeah. June 9th, 2016, Your Honor. So how does that document relate in time to the negotiation and execution of the contract? This is an admission as to the practice, Your Honor. I'm sorry. I ask you a very specific question. Certainly, Your Honor. All right? I mean, I just have very few questions. Yes, Your Honor. And when I'm done with my questions, I'm sure you'll have time to say anything you want. Thank you, Your Honor. But I'm trying to get the answer to very particular questions. Yes, Your Honor. You cite that as an admission. Is it not the case that there was testimony that after the contract was originally created, there were further discussions? Yes. And the position of the other side, which the district court, which is the trier of fact, found persuasive, was that this was an effort after the fact to get with the program and try to satisfy your client.  I forget the argument. Yes, Your Honor. That is the timing, right? Yes, Your Honor. This is a memo that takes place post the negotiation of the contract. Yes, Your Honor. Okay. I understand that. But now you're going to talk about the experts. Yes, Your Honor. So, again, the practice is established by not only the guidelines, but also – and I apologize, Your Honor. I was trying to listen. That's okay. I know you're enthusiastic and you're – Ms. Daly, some expert testified all QC vendors comply with the agency guidelines. They have to. Mr. Keith, Clayton's expert witness, testified. This is at document 161, page 67. There are guidelines, which are a list of rules. They're supposed to follow the rules. Okay. So the experts were in uniform. They're supposed to comply with agency guidelines in everything they do. And then there's the memo, the internal memo, which I just cited to you, which says in everything that they do. Now, there are two ways to re-verify. If the original verification came from the employer directly, you get on the phone and you call them. If it came from an online source, you just repeat what the original process was. That's why in the contract there is a reference to third-party report clauses. That's the only reason for that clause, to provide for reimbursement if, in fact, that's the method that's used. Does the record tell us anything about the relative percentage of files where the original verification was done by calling the employer versus online? I'm just trying to get a sense of whether one is sort of more the norm and one is the exception, or whether they're pretty even. It all depends, Your Honor, on how the particular loans were originated. It can vary from case to case. But regardless of the way, we don't have precise information on that, Your Honor. But regardless of the original method, right, whether it was one or the other, in order to re-verify an agency guideline, you had to repeat that process. That is the practice. I'm just trying to make sense of this provision that provides for online. And if the original verification being online is sort of a zebra, then it would be odd to have a contract that seems to use that as the default with Clayton doing the calling as sort of the exception when that doesn't work. On the other hand, if it's the other way around, it does make sense. And it sounds like there's not evidence in the record one way or the other that we can look at on that. Not precisely, Your Honor, but this goes to the crux of the problem. The district court did not interpret the contract in light of the custom and practice. Well, I'm not sure that's an answer to Judge Robinson's question. If there's no evidence about what is the norm and what is the exception, doesn't that go rather dramatically to the question of the materiality of any breach if there was a breach? After all, you didn't pay anything to these people. Yes. You're saying that because they, in some apparently unspecified, we now hear, a number of cases, they didn't personally recall the source when we don't even know how often the original source was someone who needed to be called. It was very prevalent, Your Honor. It was very important. I mean, it's one of the most important underwriting criteria. We don't have the exact number, but here's the problem with materiality. The district judge excluded— It struck me a little odd, you know, that if the originator calls up a number that is provided by the loan applicant who says, this is my boss, call him, and he'll say I make $200,000 a year. They call, and that person says he makes $200,000 a year as the executive whatever. And then you look to independent sources, and that doesn't seem to be the case. It would seem to me a better way of doing it, to see whether there's any other evidence that this person is what he purports to be, rather than following up with the information that he provided in the first place. Well, Your Honor may be right, but the agency guidelines are very specific. I hear you. And they say you have to do it this way, and if you're not in compliance with the agency guidelines, you can't sell your loans to the agency. There's evidence in this case that the—Clayton verified, like, whatever it is, X number of hundreds of points of data for X number of thousands of loans. And perhaps they failed in what now it sounds like is some unspecified number of cases to follow up personally on one of those data points. And maybe that's a breach, and maybe that means that they didn't provide the complete services that were called for by the contract, and that entitles you to pay nothing? Your Honor— Maybe all it would need to fix is to hire somebody else to make a certain number of telephone calls? Your Honor, the district court didn't analyze the re-verification errors because the district court said it doesn't matter because they didn't have to comply with agency guidelines. Well, there's a question of what the district court didn't look at in the evidence, but I think what we were learning is there is no evidence for the district court to look at. No, there is, Your Honor. There is. There is. But the district court didn't make findings of fact. So what is that evidence that answers Judge Robinson's question as to the number of cases in which something more than online verification was required? I don't have the precise number, Your Honor, but it was significant. Excuse me. I'm not asking for—I don't know if it's 3,112 or 27.3. What I'm asking is, is there any actual data in the record? Whatever it says, maybe you can tell me where it is, and then we can find what it says. I don't have that information, Your Honor. I know it was significant in part— Do you not have that information because it doesn't exist? Are you saying that you believe there is something like that? I do, Your Honor. But you can't tell us right at this moment what page to find it on. Correct, Your Honor. Then perhaps you could follow up with a letter and advise us where we could look for that information that answers Judge Robinson's question. I will, Your Honor. Maybe you could provide that letter a week from today, and a week later, your adversary can respond to it. I will, Your Honor. But the key point— Can I ask a question? Yes, Your Honor. Just as long as we're talking about evidence in the record. Is there evidence in the record, or what does the record tell us about the percentage of these loans that are bound for Fannie Mae or Freddie Mac versus other purchasers? The overwhelming amount was for Fannie Mae. That was why it was the focus below, Your Honor. So that's in the record somewhere? Yes, Your Honor. I can supply that information to you. Thanks. Okay, very well, Your Honor. The key point, though, is that the district court excluded custom and practice in conducting her analysis. S.P.A. 15, the district court said, I look at the four corners of the document. And then she did, and she said, I read it, and I don't find an ambiguity. Therefore, I don't consider any other evidence. That's reinforced by her memorandum, her supplemental memorandum, S.P.A. 41. Isn't there a distinction between custom and practice and kind of term of art? In other words, if you have an unambiguous contract, is it clear that you need to look at custom and practice as opposed to interpreting the language in the statute not as a layperson would do, but as the unambiguous meaning? You know, we had a case, the Supreme Court had a case recently where someone was described, his job title was tool pusher, which didn't sound like an administrative or professional job. But it was conceded by everyone in the case that that was a term of art in the oil rig industry and referred to somebody who never touched a tool. So that's one kind of situation. It's another thing to say, well, there's a sort of custom and practice that would illuminate an ambiguity. So which is this? So as this court said in Lightfoot, Your Honor, usage and custom and practice, usage of trade, is always relevant in determining ambiguity. You determine ambiguity in light of the custom and practice. The district court did not do that here. And as Judge— Did you have to define the ambiguity first? No, Your Honor. You do the opposite. As Judge Katzmann said in International Multifoods, the district court erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed. You always consider custom and practice to determine whether there's an ambiguity. Why? Because custom and practice becomes part of the contract. Your Honor's decision in Spinelli had it exactly right. Your Honor looked at the entire context. You ran through the whole analysis. And it was a highly contextualized opinion as to what goes on in the practice. That's what New York law requires. The New York Court of Appeals has said so. That's what this Court's decisions decide. In Global Reassurance, Judge Maneschi said, In determining whether a contract is ambiguous, courts look within the four corners of the document, not to outside sources. This does not mean, however, that the court may not consider proof of custom and usage to determine ambiguity. And there's a reason why. Under New York law, the contract is not the party's agreement. By definition, 1201B.12, a contract is the total legal obligation that arises from the agreement. That includes all kinds of implied things. Implied warranties, the general obligation, the obligation to engage in good faith conduct. And also, custom and practice. Why?  And the terms of a contract must be construed in light of the custom and practice. That's in the commercial code. That's how we have to do it. The district court did not. In her supplemental decision, the district court said, Sunrest offered all this evidence, including custom and practice. And the court said, Because the court found the MSA and SOW unambiguous as to this issue, the court's determination with respect to the party's obligation of the MSA and SOW did not permit consideration of such parole or other extrinsic evidence. She didn't construe the contract in light of customs and practices. That was wrong. This court has indicated that it's wrong. That's inconsistent with the Court of Appeals decisions from New York. More importantly, this infected the damages analysis, the materiality analysis. There, the court excused all the other hundreds and hundreds of loans were not reviewed properly. It said that was immaterial. But in doing so, the district court improperly excluded all the re-verification errors. When you combine the re-verification errors with all those other errors, I submit it was material. So if we agreed with you on sort of the proper analytical framework- Yes, Your Honor. I take it you would urge us to remand and ask the district court to consider custom and practice for the purpose of interpreting the requirements of the contract. And at that point, the court would weigh whatever evidence there was on both sides. You're not suggesting that we here could look at that evidence and make a determination as to what the custom? Yes, Your Honor. I can understand why the court would not want to sift through all the evidence itself. That's not this court's function. But the court did err as a matter of law in applying an incorrect standard by excluding this evidence. And it's important because in light of the custom and practice, the district court's interpretation makes no sense. Why would someone in the position of SunWest contract with someone to provide re-verifications and other post-quality, post-closed quality review services in some way that wasn't consistent with the custom? That's right. I mean, I guess that goes to my question about the questions that I was asking. If it turns out that the universe of files impacted by this is 10% of the overall- Yes. You could tell a story where that might still make sense if the universe is 90% where it needs in-person re-verification and it's going to Fannie Mae or Freddie Mac. You could tell a different, that would be a harder story to tell. And so I- Yes, I totally understand why you want to write that information. It makes perfect sense and I will provide it. But again, the other point that we make is that in order to maintain a cause of action for breach, Clayton was required under New York law, that's the McKenzie decision by Judge Swain that we cite, to prove their adequate performance. They offered no witness whatsoever to prove the adequacy of their performance. They said we performed and they submitted the invoices. No one testified on their side that the work that they did was adequate. So there's a failure of proof. They didn't meet their burden to prove their cause of action. So in addition to the materiality analysis being infected, the district court not applying the correct standard of law in reviewing the contract and then said not interpreting it in light of custom and practice. And they didn't sustain their proof. If the court- I know I'm over my time. I'd like to reserve a few minutes for rebuttal. If the court has no other questions, submit on the briefs on the other issues that we raised, including the offer of judgment under Connecticut law and the estoppel and not meeting of the mines defenses. You've reserved three minutes. Thank you, Your Honor. Thank you. May it please the court. Frank Silvestri for Clayton. I disagreed with Mr. Brunstad before he got the first sentence out of his mouth. He said that Judge Dooley erred by saying that the contract didn't have to- didn't require Clayton to perform PCQC services pursuant to agency guidelines. That's not the case. The issue was whether Clayton had to provide re-verification services, that component of PCQC services pursuant to agency guidelines. We don't dispute that the balance, the so-called file review services, had to and were performed pursuant to agency guidelines. Can you tell me a story that makes sense out of the notion that SunWest might contract with an agency like yours, or a company like yours that specializes in these post-closing services? What's the story that makes sense out of the notion that they would pay money for post-verification, employment verification that didn't comply with Fannie Mae and Freddie Mac requirements? Well, that- the post-closed quality control services are menu-driven, and they're entitled to pick whatever they want to pick for- Sure, and so if they pick re-verification services- And they had- and the contract was heavily negotiated. I'm not answering your question yet. The contract was heavily negotiated, lawyers on both sides, many e-mails and drafts exchanged. SunWest agreed to the contract that it agreed to, and that is- So, no, I hear- I understand that argument. They're, like, stuck with the deal they have. I'm really just trying to step back and ask you to tell me a story that would make it sensible, that would make it any- because your company's in this business, and you know how it's done. Why would they pay good money for post-verification services that didn't comply with the agency guidelines? I think part of the answer to that is that the great bulk of PCQC is not re-verification. It's what Judge Dooley referred to as the file review services. In this case, for example, re-verification was $53,000 in billings out of $800 and some odd thousand dollars. The issue of re-verification not being done pursuant to agency guidelines came up a couple of months into the relationship when SunWest got a report called a MORA, M-O-R-A report from Fannie Mae, criticizing it for not having done re-verification with its- I'm sorry- with its prior in-house vendor, affiliated vendor, maybe a better word than in-house, that didn't comply with agency guidelines. They hadn't been going to the original source. That's the way they had been doing it. And then, once we're into this, they get this report from MORA criticizing them for not doing it. And all of a sudden, it's the top of the world. Did your company not know what the agency guidelines required as it relates to verification services? Clayton knew what agency guidelines were required. So tell me a story that makes sense out of Clayton thinking that this customer wanted to pay good money for something that was called re-verification services, but in fact didn't comply with what Clayton knew to be the requirements of the agencies to whom they wanted to sell these. I can't tell you what was in Clayton's mind on that issue. I can tell you that that information was- the agreements were exchanged and reviewed multiple times. So you can't- And I really can't answer what was in anybody's mind. No, no, and I don't want you to- I'm not asking subjectively what was in their mind. I guess I'm asking objectively how could it be reasonable for Clayton to think that SunWest was hiring them to perform these services or contract for the performance of these services in a manner other than in compliance with the agency guidelines. All that I can tell you is that the SOW spells out a legitimate way of doing re-verification that is common in the industry. Isn't there a story, Mr. Silvestri, and doesn't it bear on the district court's finding of lack of credibility of Mr. Fernandez that they had, as you say, a menu of services that they provided and the person in charge for SunWest went down the list and checked off what he wanted and he blew it. And then after the fact, he tries to make up some stories to save his job and reputation. It's sort of, you know, what sense would it make for a person to order a pecan pie if he's allergic to nuts? But if he sends an agent to order off the menu and the agent forgets the allergy and orders the pecan pie, then pecan pie is what the contract called for. Your Honor, you're referring to a footnote in Judge Dooley's opinion in which she said that we had made an argument similar to that, that once this Mora report came in, Mr. Fernandez realized that he had gotten a contract that didn't give him what he wanted, and so he decided to turn around and blame Clayton. Judge Dooley said, I understand that that would be a permissible inference for me to make, but I don't have to, and so I'm not going to. But she did find that Fernandez was not credible. She found and said multiple times Mr. Fernandez was not a credible witness. She didn't believe him. Could you address the question of the expert testimony? Because I was not under the impression from the briefing, and I often miss things that are cited in the brief, so that could be my mistake. I was under the impression that there was no expert testimony that said this was a term of art. And Mr. Brunstad cited your expert as well as his saying that everyone in the business understands that compliance with agency guidelines is inherent in the idea of, well, maybe you're going to tell me that what those people were saying was with post-close services, and that's different in your view than re-verification services? Well, agency loans do have certain requirements. Not all loans are agency loans. So the experts actually said that, and both of them said, both our expert and SunWest's expert said that some PCQC contracts require full re-verification by the vendor, some require partial, and some require none. That goes to the menu-driven aspect of this, which is, I think, critical that there was a menu, and SunWest chose what it wanted from the menu. Does every file that gets sent for verification services have sort of at the top of it something that says, this is a Fannie Mae loan, this is a Veterans Administration loan, this is something we're bundling and securitizing or whatever is going to happen to the loan? My understanding is that that is available in the file, in the loan file. I can't give you the details of how it's presented. So is it fair to say that your position, whether this turns out to be right or wrong, I guess we'll have to do some hard thought about, is that Clayton provides what is asked for in the specific contract and doesn't really see its function as second-guessing what is required by taking note of what sort of loan, what is going to happen to this loan, and then making an independent effort to figure out what the agency guidelines might require. If they didn't ask for something, they don't get it. Is that the basic story that you're telling? Well, with respect at least to the file review services, Clayton does pay attention to what the agency is, if there's going to be an agency buying the loan or insuring it. And that's what the E-Class system does. If it's going to be agency number one that has this requirement for the loan-to-value ratio or something like that, they check it against that. If it's going to be with a different agency and they have a different requirement, E-Class checks that. And are you saying then that the proper way of understanding the custom and practice is that there is a distinction between file review and re-verification and that they could be understood in different ways, that the one could be understood as requiring you to check agency guidelines and the other not? What I'm saying is that it's the custom and practice as testified to extensively by the first witness in this case, Mr. Pollack, that it's menu-driven and it's up to the lender to pick what it wants from the menu. And that was extensively testified to by Mr. Pollack. And what we have here, just to remind ourselves, this is not a case of something that's happening on a motion to dismiss or even on summary judgment. This is a trial in which there was testimony offered by the various parties as to these various subjects. And the district court decided, made findings of fact as to what was at issue. That's correct. On the other hand, I'm sure Mr. Brunstad would reply that what his view is, is that the district court declined to consider certain evidence and declined to make findings of fact about custom and practice because she thought that the contract was unambiguous on its face rather than saying, well, maybe there's an ambiguity here on the face or if you take light of the custom and practice evidence. But your witness, Mr. Pollack, told us that the actual custom and practice is menu-driven, et cetera, and I believe that. I think that's a fair statement, that that's what the basis for Judge Dooley's decision was, that it's menu-driven and they pick what they want. Well, why wasn't that a mistake? I mean, why shouldn't she have taken cognizant of the custom and practice evidence? I mean, I think I just understood you to say, agree with your adversary that what she did was say the contract is unambiguous, so I'm not going to consider this evidence. I think the custom and practice was the way Mr. Pollack testified. It's a menu. Give it to the lender, they pick what they want. But the district court didn't say, I believe, Mr. Pollack, as to what the custom and practice is, and therefore the contract is to be interpreted a certain way. The district court, I think I heard you just say, said, I looked at the face of the contract and that's the answer. Well, she didn't say because Mr. Pollack said so, but what he said was it's menu-driven. And what she said was it's menu-driven. Exactly. Which is a slightly different thing than saying I looked at the contract and it doesn't ask, in so many words, for re-verification the way SunWest wants me to believe that it does. This may be slicing the bologna very thin, but it seems to me there is a possible distinction between making a fact finding that this is what this contract means in light of what I've heard from the experts and saying I don't need to consider the experts to reach that conclusion. But I guess you're saying the findings she made mirrored the testimony in terms of menu-drivenness, and we should infer that that's what she was doing? Well, I think it's clear that that's what she was doing. But she did emphasize that both parties were represented by counsel, and this was negotiated over a long period of time. There's lots of pages of exhibits, of e-mails going back and forth, and drafts and red lines going back and forth. Both sides had lawyers, and this was the result. So here's what I'm struggling with. The menu approach, to borrow my friend's analogy, with the pecan pie, you didn't have to order the pecan pie. But if you're going to order the pecan pie, does everybody understand that that means there's pecans in it? Is to say it was a menu, a choice from a menu, an answer to the argument that you gave me a piece of pie without pecans? Or, in fact, did the menu say you can have pecan pie with or without pecans? Or pecans, depending on where you're from. Well, it's interesting that you talk about it that way, because we've used in our own internal discussions that you can't go to a French restaurant and see Escargot on the menu and not order it and then not pay the bill because you didn't get it. And I think that's pretty much what SunWest's position is here. It was on the menu. They didn't order it. So it was on the menu to have subcontracts for verification services in compliance with the agency regulations. And then there was an alternative on the menu that was to do verification services not in compliance with agency. And they chose the not in compliance. They chose a contract that had what it had. And they could have chosen a contract that said something else. You're answering the question a little bit by asserting the conclusion. I mean, we're trying to figure out what this contract required, right? And so when you're invoking a menu analogy, I'm trying to figure out, do you have, does Clayton have a bunch of customers who contract for post-verification services not in compliance with, I mean, is that a thing? Post-verification services not in compliance with agency guidelines? I can't answer factually to that question. I can tell you that Clayton has had a substantial business in doing effectively post-closed quality control, not with lenders but with parties who were assembling loans to securitize them. And those loan packages, that's not going through an agency. Those loan packages- But you're not contending that that's what this was? No, I'm not. And so everybody understood that the bulk of these loans were going to be going to Fannie Mae and Freddie Mac. And what I'm trying to figure out is, is the notion that they chose this from the menu sort of like saying they chose pecan pie without pecans? Or is it, was there really, the notion that there was a choice, does that really reflect a reality that any reasonable consumer in SunWest's position might have possibly chosen the thing that you say they chose, which seems like the pecan pie without the pecans? That was a really bobbled question. I'm sorry. I'm not sure I answered that, Your Honor. Well, Mrs. Silvestri, is there a distinction between, I mean, I don't see anywhere in the list of services in that one particular exhibit, and maybe there are others, so I don't mean to limit you or Ms. Brunstad to that particular exhibit, but I was struck by the fact that there's not, on this, the issue isn't re-verification not according to agency guidelines. The issue is re-verification that is apparently anticipated to be through online sources. And that's what's agreed to. And that, in fact, turns out not to be in compliance with, apparently, at least some agency's guidelines. So is the question here really not a question of did they irrationally choose re-verification that doesn't comply with the rules, where there's another item, verification according to the rules? Or is it a question there's re-verification that is primarily online unless you ask us to do it otherwise? I think the answer to that is that there are ways to do re-verification, and it's up to the lender to specify exactly what they want from the menu. So you're saying it's essentially on them to figure out that they need to say, no, you have to do this in person, not online, in every case, because we basically are dealing only with agencies that require that. And I think that's consistent with what Judge Dooley found when she said that made some comments about Mr. Fernandez, and he was instructed to get a contract that handled PCQC in a certain way, and he didn't. Can I shift to just this sort of abstract question of law that's not tied to the record in this case? And that's this question we were talking about with your colleague earlier, which is in interpreting a contract, if you're trying to figure out whether it's ambiguous, and it's a contract that's in sort of a technical field, is it your view that a judge should or should not consider industry custom and practice in deciding whether the contract is ambiguous and calls for extrinsic evidence to interpret? I mean, I think a judge certainly can consider the custom and practice in deciding what terms mean and that sort of thing. I think a judge can't use custom and practice to say that black means white in a contract. But in the face of, if hypothetically this judge said, I know we took a lot of evidence about custom and practice, but because the contract on its face in the four corners is unambiguous, I'm not going to consider that. You're saying the court could have considered that. I'm going a little further saying, is it error not to have considered that? I don't think Judge Dooley erred in ruling the way she did. Well, that's why I was trying to make it abstract and not about this case, right? Is it error for a court to make a determination of clarity or non-ambiguity without considering the evidence that's been presented as to custom and practice? I think the answer to that has to be it depends. Okay. I've gone way over my time. My civil procedure professor many years ago would always ask a question and say the answer could be yes, no, or that depends. But then he would always ask the follow-up question, depends on what? Anyway, all right. We'll hear rebuttal. Thank you. Thank you, Your Honor. Judge Robinson, we ordered the pecans with the pie. In our reply brief at page 12 to 13, we cite to the testimony of Ms. Holly Delabio, who was their witness who prepared the contract, and she testified that this contract was providing everything Clayton had to offer. We selected everything on the menu, including re-verification services in compliance with agency guidelines. That was the whole point of the contract. Where in the contract does it say that? In other words, the menu analogy may be a little faulty, right, because in the menu analogy, presumably the menu is in evidence. So you've got a menu that says here's what you can order, and then you've got the waiter's notes saying what actually was ordered. So I don't know that we have in evidence or anyone has referred us to the Clayton menu, but when the witness says they ordered everything that we had to offer and then the everything is spelled out in the particular documents, so is there any place in the document if one of the things they offer is verification, strictly according to the agency guidelines of whatever agency, where would that appear in any of the records? It is collapsed, Your Honor, into the review clause. We should look at the contract itself, JA81. Validity of credit underwriting. Quote, Clayton will review each loan, not each loan file, each loan using credit guidelines provided by the company, the company being SunWest. We gave them the agency guidelines. That's undisputed. They did not follow the agency guidelines in doing the re-verification services. That is undisputed. They did re-verification work. They billed us for it. They just didn't do it in compliance with agency guidelines. And can I just go back to one other thing? If we do send this back to the district court and the district court determines that there was some sort of breach, is it your position that you're not required to pay anything, that they billed you, as Mr. Silvestri says, $900,000, $50,000 of which apparently was not performed according to the right way? You don't have to pay them anything. Yes, Your Honor, because the failures, not just the re-verification failures, but all the other ones for hundreds of loans made the reports useless to us. We had to hire somebody else to completely do the other work. They did not ask for quantum merit, Your Honor. They said we breached the contract. We didn't. You put in evidence showing that it cost you another $850,000 to hire somebody else. Yes. It was Excel who did it. And Ms. Day testified, the expert testified, that because of these errors, the reports were entirely useless to SunWest. It had to redo them. Now, remember, Your Honor. No, no, no. It had to redo them. And how much did it cost you to redo it? It's not in the record, Your Honor. Factually, I believe it was about the same. But here's the importance. The most important thing for credit underwriting is the borrower's employment status. The three things are employment status, the value of the asset, and the credit score, of which employment status is the most important thing. If you don't get that right, the review is not good. And, Judge Robinson, their explanation is not commercially reasonable. We must interpret, under New York law, the contract in accordance with principles of custom and practice. I think what I'm hearing is that there is a market for employment checks done online. And while that wouldn't be the service that would be most appropriate for your client, that's the service they chose when they entered into this contract. And it's the mismatch between that service and what your actual needs are that's causing the problem. Is that on you, or is that on them? It's on them, and here's why, under the contract. If the re-verification was direct with the employer because that was the original way, that's what they were supposed to do under the agency guidelines. If the original source was something online, they were supposed to go get that online source. That's why we have the third-party report clause. In light of commercial practice, that's why that clause is there. If the original source was something online, go online. If the original source was the actual employer, make the phone call. They didn't do that. Although what's interesting is that the third-party review offerings, when it breaks the scope of work into the different components, the contract specifically says if requested by the company, Clayton will order to review the following valuation and re-verification product. Yes. It doesn't say for those cases in which the original verification was done online. It suggests that the third party is in its entirety doing it. And then we see in the follow-up the little parenthetical in the billing sheet that says unless online doesn't work. That doesn't sound like it's contemplating that a large swath of the post-verification services are contemplated to be done by Clayton itself. But that's what they admitted to exactly that, Your Honor, on page JA 880. No, but that's again an after the fact. And there is an explanation given, which the district court apparently credited, that that was their effort to please you whatever you wanted, rather than an admission that we screwed up because the contract required us from the beginning to do that. Your Honor, when a heart surgeon performs a transplant surgery, it is not an accommodation to put in the new heart. That is how it is done. That's a different story, right? Because we're trying to figure out whether it was a heart transplant or something else that was ordered in the first place. So, I mean, really, the focus of this last discussion is about that memo, that internal memo, and what it says and what it means. That doesn't one way or the other control the ultimate answer, but- It's an admission, Your Honor. Why is it? I don't understand. There's nothing in that document that says, boy, we somehow managed to not give them what the contract called for. Yes, Your Honor. Page JA 886. They say, quote, we screwed up. Okay? They made a mistake. Why? Because Clayton assigned a new team to SunWest who was inexperienced and didn't know what they were doing. That's why the expert testimony, they testified all QC vendors comply with agency guidelines. Their experts said the same thing. Mr. Pollack was not an expert, okay? He was a witness about the testimony. I'm sorry. Could you just give me the page again of the admission that you're referring to? Yeah, JA 886. It's part of the internal emails that Clayton was sending between themselves. Is this where it says, we heard you loud and clear. You're worried about whether we understand and follow agency guidelines. That's on the 885. And then we absolutely do and do this for many clients and are regularly in touch with the agencies. Is that what you're talking about? If you go a few pages after that, Your Honor. Okay. After the memo, there is their own internal email back and forth where they're talking about this. And the last thing that they point out is we screwed up in escalating and here's why. And the memo was the explanation why. They admitted they screwed up. Again, we got the inexperienced team who didn't know what they were doing. They made a lot of mistakes, not just in one month, but month after month after month after month. So we finally terminated the contract. And, yes, Judge Robinson, it is an error of law not to consider custom and practice. Because under New York law, custom and practice is part of the contract. It's not even properly extrinsic evidence. Because you must construe custom and practice in interpreting the contract. This court said so in Lightfoot. In International Multifoods, Judge Katzman wrote, quote, the district court erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed. And to be abundantly clear, the district judge made it perfectly clear she was not considering anything other than looking at the contract on page 41, on SPA 41 in her supplemental decision. The district court wrote, because the court found the MSA and SOW unambiguous as to this issue, meaning whether they had to perform in accordance with agency guidelines, the court's determinations with respect to the parties' obligations under the MSA and SOW did not permit consideration of such plural or other extrinsic evidence. She said she was precluded from considering custom and practice. And she didn't. There's no evidence that she did. All the evidence is that she did not. Again, if you look at her analysis, SPA 14, 15, 16, of her opinion, she looked at the four corners of the contract. Then she looked at the contract itself, and she said, I read it. I think it means this. I don't think it's ambiguous. I don't consider anything else. That was an error of law that requires reversal. And then again, that mistake infected the materiality analysis, because the district judge excluded all the re-verification errors in concluding that the other mistakes were immaterial. I think you've said that. Yes, Your Honor. We'll take the matter under advisement. I've asked you to provide a letter brief, no more than two pages. Yes, Your Honor. Thank you very much. Addressing those specific points that we requested. Thank you. We will take a brief recess. Court is standing in recess.